1158 NRE PERSONALIZED MEDIA Mr. Scott, good afternoon. Good afternoon, Your Honor. Welcome. May it please the Court, one of the basic problems with the decision by the Board here and the argument that's made by the solicitor and the director is the way in which the traditional way that this Court has enunciated how claim construction should be conducted and how then a construed claim should be applied to a reference, it was ignored. What happened here, and I think it's one of the fundamental errors in the Board's decision, was and let me just back up and say one thing, the Board was under a great deal of strain. This, the examiner here had numerous rejections for each of the claims and of course with the page limit and everything and the size of the appeal, the Board's decision to some degree appears to be cursory. I believe it took its job seriously, but what it did wrong was to look at the references apply them to the claims without giving serious consideration to the way in which you construe a claim and then apply it to a reference. And so it's against that backdrop that you have to look at what was done here. And so, again, the important point is how do you construe the limitations that are at issue here? And really, of course, I'm just taking the three of the claims of the patent in suit 6, 7, and 10 deal with what's referred to either as a non-standard television transmission or more correctly looking at the claim limitation in 10, a television transmission which is not a standard television signal, or in the case of claims 6 and 7, a separately defined television transmission which is other than standard video or audio television. All right, now, again, to really understand how this is, you know, how to construe these terms, you have to look at the disclosure of the patent initially, and then the way of, first, the way the language is in the claims, but important here how the applicant has defined his invention and how he shows that it is used in the context of his disclosure. I mean, can you just focus yourself then on applying that rubric of analysis to this case? Okay, the board says Shetterly anticipates that reference, correct? That's right. And what is your argument as to why the specific phrase in the claim that you cited is not contained or is different than what Shetterly does? Specifically, it is that a separately defined transmission is, all right, going back to the disclosure of the patent, the patent has to do with including embedded data in television transmissions of several different types. The applicant specifically discloses that the data can be embedded in an analog television signal in the video portion of that, particularly, for example, in the vertical blanking interval. He alternatively discloses that it can be in the audio portion, but he also refers to and specifically defines a so-called separately defined transmission, which is intended to be a purely digital signal. Now, what happens is you'll see in the pictures that are in the briefs, there's a signal decoder, and that signal decoder receives a transmission of a particular frequency. Do you want to give us a cite to the patent? Yeah. If you look in the, it's figure 2A, and it's found in the appendix at 156, the description of how it operates. What happens is you have a specific frequency of interest, which can be one of these various alternatives, but what the patent discloses specifically is that the specially defined frequency needs to be a digital signal because it's imposed either on a separate frequency or a separate particular component, and it is, once it's detected, it is transferred directly to a digital detector. Now, the important point here is that in all of the other embodiments, the signal, for example, blanking interval is in the prior art that's cited, that then must go through a second level of demodulations, for example, a line receiver, and then to be inserted into the digital detector, whereas the specially defined frequency or transmission is defined as being separate from those other two lines of video and audio, and then it can, because it's already a digital signal, be directly submitted to the digital detector. Again, what the claim specifies is that you have these various alternatives and that this particular claim is specifically directed to the digital embodiment that's shown in example seven and that it is not an analog signal. Now, what the board... No, let me turn to... Okay. The claim, claim six, for example, just talks about the television program transmission being separately defined from standard analog video and audio television. That's correct. So the claim is fairly broad. I would suggest to you, Your Honor, that that is not the case. It is... Well, it doesn't say that it's different in any particular way. That was my point. What it says is that the term specially defined is used in a particular way in the patent to mean that separate line of transmission that's digital, and that what, when this, and therefore... We're in the claim or in its... It's in the specification. It's what it says in the specification is that there are these three paths. Are you still talking about 156 columns, 21 and 22? Right, and figure 2A of the patent. But nonetheless, it says the program transmission being separately defined from standard analog video and analog television. There's nothing that says that separately defined has a particular meaning, and in fact, in the patent office, the patent office is entitled to interpret claims given their, and giving them their broadest reasonable interpretation. And the argument, as I understand from the office, is that, at least with respect to the Shutterly reference, there's a reference that converts the audio into a digital signal and then embeds that in the video, which is not a standard analog video and audio television signal. Well, that's the position that the patent office is taking, and why that's wrong. When you look at what a television transmission is, now these claims, particularly 6 and 7, have been here before and are the subject of a prior decision. And what the court held when it considered these claims the last time was that a transmission was a particular group of signals that were imposed or enveloped in a particular carrier. Therefore, what it's saying is you have a group of signals that are going to drive a television. Now, what happens is, and that's the important point. When you're talking about whether the signal is standard or not, you're not talking about, for example, whether you're embedding digital data in an analog signal, which was in fact conventional and standard in 1981 when this patent was filed for. What you're talking about is the composition of the signal that drives the television. So in an analog signal, you have a portion of the signal that drives the electron gun back and forth that syncs signals. You have the portion of the signal, for example, that tells the pixel to be a particular intensity, the luminance. You have the portion that tells you what the color is. And it's that transmission that's standard or not, because that's the format of the signal that drives that television receiver to give you the picture you want. The adding of additional digital data to that standardized signal was conventional and known, the very term used by the Patent Office in 1981, that it makes the signal of Shutterly a standard analog television signal, because what Shutterly does is take, now again, Shutterly is... You're not saying that in the Shutterly system that the television signal could be received by a standard television receiver? Yes, it could be. Even with the audio embedded in the video signal? Yes, because the video is standard. So you could see the video, but could you hear the audio transmission? Well, that's what's not clear from Shutterly. Shutterly is what he's talking about. I would submit that Shutterly doesn't suggest that you can obtain the audio signal on a standard television because it's a different system. Well, no. What he's talking about is an alternative, which again was conventional in 1981, of having an audio subcarrier in which you would impose a digital signal, or in this case, instead of separately imposing it to get like a stereo sort of situation, you would take that signal and place it in the vertical blanking interval. But that doesn't change the basic format of the signal, because it's got to have... In order for the television receiver to receive it, it's got to have the audio subcarrier that's going to be stripped off. It's got to have all of the composition of the video. So it's simply a standard video television signal in which you have placed an alternative type of data. You're into your rebuttal. Do you want to reserve your time? Yeah, I do want to reserve it. All right. Thank you very much. Thank you. I'm going to save your time. Mr. Kelly. Good afternoon. Welcome. Good afternoon. May it please the court. Before I get into the gory details of the invention, I just want to speak for a moment about what the board did here, because the board didn't do anything wrong, nor has PMC demonstrated that they did do anything wrong. They don't point anywhere to the board's decision where this alleged mix-up of the order in which construction and then anticipation analysis is performed. In fact, they can't do that because the board did exactly what they say the board is supposed to do. At page A4 of the record and A62 of the record is where the board has a standalone construction of the claim and then moves into the anticipation analysis. There is no requirement, as this course recently said in Jung, that a certain procedural mechanism be used to reject a claim. What's important under section 132 is that an applicant or a patentee in the case of a re-examination is put on notice of the office's position well enough so that they can respond, and that clearly was done here. So I don't think the board did anything procedurally wrong. But I'd like to step back just for a second and take a look at the technology, because I think what's helpful here is to realize just how broad they say their invention is in their blue brief and in their patent and just how broadly they've claimed it. And the way they characterize their invention in their blue brief at page 9 is they say their invention is to take some digital signals and embed them into a standard television signal. That mimics what their patent says at page A150 in the background of the invention, that they take additional information and they embed it in a television signal. And that's precisely how they've claimed it. Now, Judge Lynn asked, well, isn't what happens in Shutterly, isn't it a different analog video and audio signal? And what Mr. Scott did is he explained why it's not a standard video signal or why it is a standard video signal. But that's not what the claim requires. The claim requires that it be a separate transmission. Shutterly is a separate transmission. That's because Shutterly strips off the audio, digitizes it, encrypts it, enhances it, and then injects it into the video signal along with a code that allows the receiving end to re-enhance it and also the receiving end then takes it, un-digitizes it, puts it in the right order, and puts it on the screen so that someone can watch TV. That's nothing, there's nothing standard about what Shutterly does. Mr. Scott said repeatedly that their invention, the way they've claimed it in, for example, claim six is that it's digital and he points to figure 2A. Well, in fact, nowhere in the description of figure 2A is that mythical path C that he keeps focusing on. It doesn't say it's digital at all. All it says is that it's separately defined. And I direct the court to the same page Mr. Scott did, page 156. And in column 21, that's where Shutterly, I'm sorry, that's where PMC goes through. Page A156 of the record. And what we see beginning, for example, at line 30 of column 21 is that we have a standard demodulator, an amplitude demodulator. So a single frequency goes in and it gets demodulated. And what that means is that the carrier gets stripped off. So the way things like this are transmitted, if there's one wave that goes up very fast, up and down, that's the carrier. And that up and down changes its characteristic. A demodulator strips out the carrier, so you're left with the information signal. That transmission then gets sent to those three paths. When we get down to path C, which is about line 62, it says, in the third path, designated C, inputs the separately defined transmission to a digital detector, 38, which detects signal information embedded in any other information portion. It doesn't say that the other information portion has to be digital. And in fact, there's no way to glean that from this figure, because it has a digital detector in path C. It's there to detect the digital information, just like the digital detectors in path A and B detect the digital information. And perhaps most importantly, from a sort of a global claim construction perspective, it's clear how to recite that something's digital or analog. If what they meant in their claim was it had to be digital, they could have easily said that. There's nothing in PMC's patent that suggests they invented the transmission of digital television. And our position is, as we've described in our briefs here, that all that's required is that the transmission that has this digital information inserted to it is somehow different from a normal transmission, which is precisely what Shutterly has. Shutterly is, of course, cumulative of the other references. The other references have additional information embedded just as well. Mr. Scott did not discuss Claim 56. I'm happy to answer any questions about Claim 56. But if the court has none, we would rest on our briefs as Mr. Scott just did. All right. Very good. Thank you, Mr. Kelly. Thank you. Mr. Scott, you've got a couple of minutes. No, I don't. And I just want to make one point here. That is that it is incorrect to say that this invention was directed solely to the embedding of data into one type of transmission, particularly at 156 that I referred to earlier. And also, the court might look at the disclosure of the patent at A232. There is a specific disclosure of a purely digital application. And that refers directly to the Path C embodiment that we looked at with respect to A156. What happens here is that the patentee has disclosed that there are, well, for example, in an analog transmission, you have to take the data, the signal. And if it's video, you have to conform it to drive the electron gun of the device. But what you have to do if you've embedded digital data in this, and this is shown in figure 2A, you have to take the digital data that's in a particular line, extract it, and then it can be in a digital format after you've extracted it from that line. And then you send it to the digital detector. In the case of the audio, you have to have the audio detector, a high bandpass filter, because you're going to put the digital data at the highest frequency. And then you send it to the digital detector. In the Path C embodiment, because it's already in a digital format, you send it directly to the detector. And both of the references that I've referred to in 156 and also in the other portion of the patent dealing with example C, that is made clear. Hey, you referred us to page 232 of the appendix. Yes, sir. Is there any particular column and line number that you would like to call our attention? Yes, I would direct you, particularly, and it's cited in our brief, at 62-65 that refers to the particular variations of digital television. Which column, 173? 174. Okay. All right. Thank you very much. Your time has expired. The case is submitted.